# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

CATHY S. BERG,

    Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

    Defendant.

No. C04-4093-MWB

**REPORT AND RECOMMENDATION**

## *TABLE OF CONTENTS*

*I.*     *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*II.*    *PROCEDURAL AND FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . *2*
    *A.*     *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*
    *B.*     *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*
          *1.*     *Introductory facts and Berg's hearing testimony* . . . . . . . . . . . . . *3*
          *2.*     *Berg's medical history* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*
          *3.*     *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *11*

*III.*   *DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND*
       *THE SUBSTANTIAL EVIDENCE STANDARD* . . . . . . . . . . . . . . . . . . . . *12*
    *A.*     *Disability Determinations and the Burden of Proof* . . . . . . . . . . . . . . *12*
    *B.*     *The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . . . . *14*

*IV.*   *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *18*

*V.*     *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *19*

## I. INTRODUCTION

The plaintiff Cathy S. Berg ("Berg") appeals a decision by an administrative law judge ("ALJ") denying her application for Title II disability insurance ("DI") benefits. Berg claims the ALJ failed to give proper weight to her subjective complaints, and gave improper weight to the lack of objective medical evidence of Berg's disability. She further argues the ALJ failed to give due consideration to fibromyalgia as a disabling illness. (*See* Doc. No. 8)

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural Background

On August 13, 2002, Berg protectively filed an application for DI benefits, alleging a disability onset date of September 30, 1997. (R. 96A-96D) Berg alleged she was disabled due to Sjögren's Syndrome, fatigue, back pain, depression, seizures, and high blood pressure. (R. 98) She stated that as of September 30, 1997, which was her date last insured, her condition limited her ability to work because she was unable to stand or walk distances, she had pain in her legs and back, she slept a lot, she had "mental blanks" and diarrhea, she sat for long periods, and her legs hurt and swelled. (*Id.*) Her application and request for reconsideration both were denied. (R. 76-80, 85-87)

Berg requested a hearing (*see* R. 88), and a hearing was held before ALJ Lauren R. Mathon on November 4, 2003, in Sioux City, Iowa. (R. 23-75) Berg was represented at the hearing by attorney Daniel L. Hartnett. Berg was the only witness who testified at the hearing.

On March 19, 2004, the ALJ ruled Berg was not entitled to benefits. (R. 11-18) Berg appealed the ALJ's ruling, and on August 12, 2004, the Appeals Council denied

Berg's request for review (R. 6-9), making the ALJ's decision the final decision of the Commissioner.

Berg filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 2) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Berg's claim. Berg filed a brief supporting her claim on December 30, 2004. (Doc. No. 8) The Commissioner filed a responsive brief on February 16, 2005. (Doc. No. 11).

The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Berg's claim for benefits.

### B. Factual Background

#### 1. *Introductory facts and Berg's hearing testimony*

At the time of the hearing, Berg was fifty-five years old and married. She is five feet tall and, at the time of the hearing, weighed 220 pounds. She noted that at the time of her alleged disability onset date in September 1997, she weighed about 160 pounds. (R. 27)

Berg worked for fourteen years at Walgreen's drug store in Sioux City. She started in 1976 or 1977, and worked until 1992 or 1993. Berg's earnings at Walgreen's dropped dramatically in 1989, when she went from full-time to part-time work. (R. 27-29) She worked twenty hours per week during 1990 and 1991. (R. 30) She finally quit working at Walgreen's in 1991, and she explained her reasons as follows:

> The lifting got to be too much. I couldn't do it anymore. Stress of the job even got to be too much. It was getting too hard for me to – I would get so tired that I

> wouldn't be able to – almost half the time couldn't drive home. I would work late hours and there was times I couldn't drive home. I'd have to sit and wait and kind of like take a little nap before I could go home.

(R. 29)

From 1992 to 1996, Berg tried earned money from making crafts that she sold at craft shows. She was making Native American art, jewelry, and leatherwork. She eventually quit doing shows because she could not handle the lifting. In addition, she became unable to hold the beads and string tightly enough. Her arms would hurt and her hands would go numb. (R. 30-31) At some point prior to 1997, Berg had surgery on both wrists for carpal tunnel syndrome, but according to Berg, her problems with her hands and arms that prevented her from doing her beading work were not related to her carpal tunnel syndrome. (R. 30-32)

In addition to pain in her hands and arms, Berg also had pain in her back and shoulders. She was able to do dishes because she could lean on the sink and take breaks, and she could do laundry because she could sit down as needed during the task, but it was difficult for her to dust very often and it would take her several days to dust the house. She also had problems vacuuming. She bought a light-weight vacuum cleaner in hopes it would help, but she "still ended up trying to vacuum sitting on a hassock," which bothered her arms and shoulders. (R. 33-35) The hassock was on rollers and she would try to roll around and vacuum. (R. 34) According to Berg, she was prevented from dusting, vacuuming, and doing dishes normally due to muscle pain in her legs, back, and arms. (R. 35)

More recently, Berg has been diagnosed with fibromyalgia. She believes fibromyalgia has always been the cause of her difficulties, noting her pain is the same

4

now as it was in 1997, except now the pain is constant instead of intermittent or related to exertion. (*Id.*)

She stated if she had been able to work in 1995, 1996, or 1997, she would have done so. Her husband retired from the U.S. Postal Service in August 1995, and since then, he has held part-time jobs. They have lived on his part-time wages and his pension, and they could have used the money if Berg could have worked. (R. 35-36)

In addition to her physical problems, Berg was emotional and depressed. She slept a lot and did not want to leave the house. She stated she "had problems trying to deal with life on life's terms at that point." (R. 36) She opined her depression was due to the fact that she was in pain, but no one would believe her when she said she was in pain. (R. 37) She knew there was something wrong, but "nobody could find it." (*Id.*)

Berg and her husband bought a house in the country in 1992. Berg was able to maintain a garden for the first few years, but she gave up gardening in 1996 because she could not get up and down the incline. (R. 39-44) Berg described her condition back in 1995-1997 as follows:

> I would get up in the morning. I can remember – I used to have a garden down below. I had to quit doing that, because I couldn't make it down to the garden. I live in the country so when the garden's – we call it the bottom, but it's not really that far from the house. It's maybe 1,500 feet from the house. And I would have to go down to the garden and then I'd have – if I could get down there. And I was having trouble getting to the garden. And if I got there, I'd have to sit down and have a chair down there to sit down. I could do a little bit and then it took me longer to get up the hill. We had a little bit of rise there to get back to the house, because I just couldn't do it. And I'd get so tired. I'd come in, and I'd go to sleep, because I hurt. And I was on heating pad. They had me on high do[se] of Ibuprofen, that type of thing, to try to get the pain to go away. And it didn't. It didn't

> help.  It just didn't help.  And they put me on – I don't
> remember when, they put me on Vioxx, which helped some.
> It did help some, but I was still on Ibuprofen for the pain.

(R. 37-38)  The Ibuprofen Berg took was prescription strength, prescribed by a doctor.  She took 800 milligrams, four times a day.  (R. 39)

Berg specifically described her daily routine as it existed during the summer of 1997.  She would get up about 8:00 a.m., and do some housework.  She would rinse the dishes and put them in the dishwasher.  Once a week, she did the laundry.  She could load and unload the washer and dryer, but she could not carry a basket of clothes; she would slide the basket across the floor.  Around 11:00 a.m., she would have to take a nap because she was exhausted.  She would have pain in her back, hips, and legs.  She sometimes saw a chiropractor, which gave her relief for a day or two but then the pain would return.  She was able to fix dinner, and she and her husband did the grocery shopping together.  She could carry a gallon of milk but not a whole bag of groceries.  Once a week, she would go downtown and volunteer, answering phones at the Al-Anon information center.  (R. 44-47, 59)  She made attempts to vacuum, scrub the floor, or do other activities, but they caused her too much pain in her lower back.  (R. 48-49)

In addition, Berg attended a weekly Al-Anon meeting, and she attended a weekly open Alcoholics Anonymous meeting with her husband.  She stated she had been attending Al-Anon meetings for fourteen years.  (R. 60)  She sponsors people in Al-Anon, but she does not go to their homes, they come to hers, and she also talks to them by phone.  (R. 61)  She was also an Alateen sponsor.  Berg estimated she spent about ten minutes each day reading Al-Anon and AA literature.  She stated that before she got sick, she was district representative and a group representative for Al-Anon, and she went to the conferences twice a year, and a district meeting every other month.  She held these positions through 1997.  (R. 61-64)

In 1997, Berg and her husband went to NASCAR races for recreation. She would have to rest during the walk from the car to their seats. They always went up into the enclosed area at the race track because the odors and fumes bothered her sinuses and allergies. She was unable to walk up an entire flight of stairs, and had to stop and rest after ten or twelve steps. She also was unable to walk very far on flat surfaces due to pain and muscle fatigue in her legs and back. For example, she would have to sit down and rest after walking approximately sixty feet from one end of her house to another. (R. 47-48) She would sit down and rest when her pain level reached a six or seven on a ten-point scale. (R. 48) She noted her home is a single-level ranch-style home, all on one level except for the basement, and she seldom has to go to the basement. (R. 70-71) However, if she does have to go to the basement, there is an outside door that she can use and then there are only three large steps for her to navigate. In 1997, she was able to get to the basement that way, and she would sit and rest when she got down there, and then again when she came back up. (R. 71)

Berg had trouble falling asleep at night in 1997 due to pain. She stated she "had to fight real hard to lay there for sometimes hours," using a heating pad, until the pain subsided enough that she could fall asleep. Once asleep, however, she slept well, and after she started using a CPAP machine for sleep apnea, she was able to sleep through the night. (R. 47-48)

In 1997, Berg reported earnings of $1,271. This income was from the sale of all of her craft supplies and inventory, including a trailer she had been using to transport her craft materials. Since that time, due to her physical problems, she has not attempted to engage in craft sales or other business endeavors. (R. 49-51) She noted that on one occasion when she was preparing to do a craft show, she had a mild seizure. Although she was taking Tegretol, she still would have "breakthrough seizures" from time to time.

7

(R. 52-53) She also was taking medications for high blood pressure and for allergies. (R. 54-55)

Berg stated she was diagnosed in the fall of 1997 with Sjögren's syndrome. According to her, the symptoms of the disease include dry mouth, dry eyes, and problems with her tongue, jaws, nerves, and muscles. She began having symptoms prior to the time she was actually diagnosed. She noted that once in the early summer of 1997, she went to an Al-Anon meeting and someone asked her if she had the mumps. She stated she was "all swelled up." When the problem occurred again, she saw a specialist who diagnosed the condition. (R. 55-56) She also was having problems with muscle pain, and with dry mucus membranes prior to September 1997. (R. 56)

In addition, prior to September 1997, Berg saw a neurologist and a neuro-psychologist. She was having difficulty with her memory and what she described as "personality-type changes." She stated the doctor diagnosed her with depression, which she elected to deal with in Al-Anon rather than going into therapy. (R. 68-69, 71-72)

Berg recalled that she was "pretty healthy" during 1996. She stated the reason she could recall her condition in 1997 with clarity was because it "was a recurring nightmare." (R. 57) However, she stated that in 1996, she still would have to take a nap in the afternoon, and take breaks while she was doing housework or crafts. (*Id.*) She stated she did "[a] lot more" craft shows in 1996 than she did in 1997. (R. 65) She noted the craft shows were never farther than thirty miles away, and usually lasted only one day. (R. 66, 70) She had another lady who helped her at the shows; she never went alone. (R. 73)

## 2. Berg's medical history

Berg must show she was disabled prior to her date last insured, which the ALJ found to be September 30, 1997. Thus, the court will focus on medical records indicating Berg's condition at and around that date.

The record indicates Berg was being treated by a neurologist for seizures as far back as August 1979. (*See* R. 151) As of September 1996, she had been seizure-free since 1994, and was doing well on her current medication regimen without side effects. She had a diagnosis of complex partial epilepsy. She told her neurologist she had "elected not to apply for Social Security" at that point in time. (R. 183)

Berg had an apparent seizure in July 1997, after reportedly being seizure-free since 1994. She saw a neurologist in September 1997, and he diagnosed the July 1997 event as a probable breakthrough complex partial seizure, possibly associated with disruption of her normal sleep/wake schedule. He altered her medications somewhat and ordered a carotid duplex/TCD to assess Berg's visual disturbance. (R. 181-82)

Berg had an abnormal brain MRI and was seen at the Mayo Clinic in May 1988, for a neurological evaluation. An MRI of her head was performed and revealed some tiny lesions in her brain. (R. 160) The abnormalities were still present in 1997. (*See* R. 178)

She was treated for right shoulder pain as far back as 1980, when various treatments were attempted without relieving her pain. Doctors made a "presumptive diagnosis" of "either recurrent bursitis or bicipital tendonitis." (R. 169)

In November 1996, Berg complained of pain along the base of her right foot. When conservative treatment by her family doctor failed to resolve the pain, she was referred to an orthopedist. The doctor reviewed X-rays of her right foot taken in November 1996, and found no evidence of a fracture. He opined she had a soft tissue injury and prescribed Naproxen, ice, elevation, and orthotics. (R. 336) The radiologist's

report from review of the X-rays indicates the films demonstrated osteoporosis and mild osteoarthritis in Berg's foot. (R. 168)

From the record, it appears Berg first saw a doctor for consultation regarding a possible systemic inflammatory disease on October 22, 1997. Records indicate she was referred for the consultation because she had an elevated sedimentation rate and positive ANA level. However, in providing her medical history, Berg apparently did not complain of significant joint pain or back pain. (*See* R. 332) She reported a history of seizure disorder, sinus problems, and hypercholesterolemia. Upon examination, she exhibited "mild to moderate tenderness over the right lateral epicondyle," and mild tenderness in her upper arms, anterior chest, and hips, but she had good ranges of motion and excellent muscle strength throughout. (R. 334) No diagnosis was made at the time of the evaluation, with the doctor opting to await the results from previous laboratory studies and an MRI scan. He recommended no treatment at that time. (R. 334-35)

Berg complained of back pain and severe right buttock pain in December 1997, and X-rays demonstrated osteoporosis, arteriosclerotic vascular calcifications, and mild degenerative facet disease at three levels. (R. 163, 204) A follow-up MRI demonstrated "[m]ild to moderate neural foraminal stenosis at L5-S1 due to spondylosis[.]" (R. 203)

Berg complained of hip pain in early 1998, and she was treated with an injection into the right trochanteric bursa. She experienced substantial improvement in her pain, although she still had some pain. (R. 173-77) By the time she saw a neurologist regarding her hip pain, she had been diagnosed with Sjögren's Syndrome, and had "a number of abnormal rheumatological tests or serological tests and abnormal liver function tests." (R. 175)

An MRI of Berg's head on April 1, 1998, continued to indicate "multifocal bi[la]teral small periventricular and peripheral white matter hyperintensities." (R. 195)

The radiologist noted several etiologies of small vessel disease in addition to Sjögren's could produce the MRI findings, including SLE, migraine headaches, and a demyelinating process. (*Id.*)

### 3. *The ALJ's decision*

The ALJ found Berg did not have a severe medically-determinable impairment as of her date last insured. He found no evidence in the record to support her allegation that she was completely disabled as of September 30, 1997. Further, he found it suspicious that her alleged disability onset date was the same as her date last insured. He noted the only real evidence to support Berg's claim was her testimony that her daily activities were severely limited in mid to late 1997. However, the ALJ discounted this testimony for two reasons. First, he noted Berg's allegations that her daily activities were limited by her condition could not be verified objectively with any reasonable degree of certainty. Second, he noted that even if Berg's description of her limited daily activities was viewed as credible, it would be "difficult to attribute that degree of limitation to [Berg's] medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in [the ALJ's] decision." (R. 16)

The ALJ noted no physician had set any limits on Berg's activities during the relevant time period. Berg had not mentioned extreme fatigue or widespread tender points to any of her doctors. And no doctor had prescribed high levels of pain medications for Berg prior to September 30, 1997.

Because the ALJ did not find Berg to have a serious medically-determinable impairment during the period in question, he found she was not disabled and not entitled to DI benefits. (*See generally* R. 14-18)

## III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . .

12

> Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon, supra.* The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if

necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v).

### B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial

evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court must affirm the ALJ's factual findings if they are supported by substantial evidence on the record as a whole. *Id.* (citing *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002); *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998) (citing *Matthews v. Bowen*, 879 F.2d 422, 423-24 (8th Cir. 1989)); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier, id.*; *Weiler v. Apfel*, 179 F.3d 1107, 1109 (8th Cir. 1999) (citing *Pierce v. Apfel*, 173 F.3d 704, 706 (8th Cir. 1999)); *accord Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)); *Hutton v. Apfel*, 175 F.3d 651, 654 (8th Cir. 1999); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022 (citing *Craig*, 212 F.3d at 436); *Willcuts v. Apfel*, 143 F.3d 1134, 1136 (8th Cir. 1998) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S. Ct. 456, 464, 95 L. Ed. 456 (1951)); *Gowell*, 242 F.3d at 796*; Hutton*, 175 F.3d at 654 (citing *Woolf*, 3 F.3d at 1213); *Kelley*, 133 F.3d at 587 (citing *Cline v. Sullivan*, 939 F.2d 560,

15

564 (8th Cir. 1991)). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline, supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo.*" *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young,* 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
> 1) the claimant's daily activities;
> 2) the duration, frequency and intensity of the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects of medication;
> 5) functional restrictions.

*Polaski,* 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002).

## IV. DISCUSSION

Berg argues the ALJ erred in relying solely on the lack of objective medical evidence in the record. She argues her subjective complaints were sufficient to prove disability, citing *Laird v. Stilweill*, 969 F. Supp. 1167, 1182 (N.D. Iowa 1997) (Bennett, J.). Indeed, in *Laird,* the court explained that objective medical evidence is merely one factor for the ALJ to consider in conducting a proper credibility analysis. *Laird,* 969 F. Supp. at 1181. Further, the *Laird* court held "'an adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not support them.'" *Laird,* 969 F. Supp. at 1182 (quoting *Dodson v. Chater*, 101 F.3d 533, 534 (8th Cir. 1996)). The court instructed adjudicators to discount a claimant's subjective complaints "only if there are inconsistencies in the evidence as a whole." *Id.* Moreover, the court held, "[I]t is not necessary for a claimant who files for benefits in the Eighth Circuit to produce objective medical evidence that the symptoms he or she suffers as the result of an underlying impairment are severe enough to cause disability. A claimant's subjective complaints alone are sufficient to prove disability." *Id.*

Berg argues her subjective complaints of her condition in mid to late 1997 demonstrate that although she had not been definitively diagnosed with Sjögren's Syndrome or fibromyalgia at that time, she nevertheless exhibited symptoms of those diseases and this bolsters her credibility. Thus, she argues the ALJ erred in failing to give proper weight to her subjective complaints.

The Commissioner notes the ALJ did not summarily dismiss Berg's subjective complaints, as Berg argues. The ALJ considered the fact that Berg failed to complain to her doctors about the types of disabling pain and physical limitations that she raised in her testimony at the hearing. The ALJ noted Berg was not taking any regular pain

medications in 1997, and no doctor had placed any limitations on her functioning. Her seizure disorder was well controlled by medication. Further, regarding Berg's argument that the ALJ should have considered fibromyalgia in his analysis, the Commissioner notes Berg was not diagnosed with that condition until four years after her alleged disability onset date, and no medical professional has opined Berg suffered from the disease as far back as September 30, 1997.

Like the Commissioner, the court finds this case to be distinguishable from *Laird* and the other authorities cited by Berg. Berg's pain complaints to her doctors and their treatment notes in the few months following her date last insured indicate she likely was experiencing some pain on her date last insured. However, there is little in the record to substantiate her claim of total disability as of her date last insured.

Like the ALJ, the court has been unable to find support in the record to substantiate Berg's claim that she was disabled prior to her date last insured of September 30, 1997. Although the record contains evidence that Berg may have become disabled after that date, her failure to demonstrate that she was disabled prior to September 30, 1997, is fatal to her claim.

## *V. CONCLUSION*

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[1] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1)(C) and Fed. R. Civ. P. 72(b), within ten (10) days of the service

---

[1] Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix,* 897 F.2d 356 (8th Cir. 1990).

of a copy of this Report and Recommendation, that the Commissioner's decision be affirmed.

**IT IS SO ORDERED.**

**DATED** this 23rd day of August, 2005.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT